IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 07-cv-00004-WYD-KLM

JAVIER STONE,

      Plaintiff,

v.

CITY OF WHEAT RIDGE COLORADO;
WHEAT RIDGE POLICE OFFICER JOSIFEK,

      Defendants.

---

## ORDER

---

THIS MATTER is before the Court on the Motion for Summary Judgment of Defendant the City of Wheat Ridge [doc. #179, filed March 26, 2008] and the Motion for Summary Judgment of Defendants Wheat Ridge Police Officers Paugh, Hester, and Josifek [doc. #180, filed March 26, 2008]. The Officers' Motion incorporates by reference the Motion by the City of Wheat Ridge. On May 20, 2008, Defendants Paugh and Hester were dismissed with prejudice pursuant to stipulation [doc. #188]. Plaintiff Javier Stone responded to both Motions on May 9, 2008, and Defendants City of Wheat Ridge and Officer Josifek replied in support of their respective Motions on June 13, 2008. On September 4, 2008, Plaintiff submitted a supplemental response to the City of Wheat Ridge's Motion, and on October 6, 2008, the City of Wheat Ridge submitted a supplemental reply. Having considered Motions, the responses, replies, supplements, and pertinent exhibits, I enter the following written Order.

**RELEVANT FACTS**

I note that voluminous facts have been asserted by both parties in connection with the present Motions and briefing. I have stated those facts that I deem pertinent to my ruling. I have, however, construed all of the facts in the light most favorable to Plaintiff as I must for purposes of this summary judgment motion. *See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008).[1]

This case involves alleged discrimination arising from police responses to neighbors' complaints with regard to a club owned and attended by Hispanics. Plaintiff Javier Stone is the sole shareholder of Stone International Market, Inc., a Colorado S-Corporation ("SIM"). SIM owns the El Dorado, a reception hall located in Wheat Ridge, Colorado. The El Dorado is "a special events venue that [Plaintiff] rents out primarily for wedding receptions and quinceanera[s]. [Plaintiff] is Hispanic, as are most of the employees, clients and guests of the El Dorado." Response to City's Motion at 1.

Plaintiff began renting the El Dorado for social events in December 2003. Thereafter, neighbors who lived near the club began complaining about the noise and other disturbances coming from the events at the El Dorado. The Wheat Ridge Police Department responded to those calls, issuing citations on some occasions and not on others. On some occasions, police officers arrived to find that they could not hear noise coming from the club, and they would still notify the El Dorado of the complaint without

---

[1] I also note that I have cited to the record only where the facts are disputed.

-2-

issuing a citation.  *See* Defendants' Ex. O (Depo. of Officer Paugh) at 14-20.[2]  Plaintiff

also alleges that officers at times would show up several times per night and would also

show up when events were not going on just to check up on things.  *See* Plaintiff's Ex. 1

(Depo. of Plaintiff Javier Stone) at 106; Ex. 2 (Depo. of Plaintiff's ex-wife Yamileh

Santana) at 22; Ex. 36 (Affidavit of Joel Pena Hernandez,[3] manager of El Dorado) at 2,

4-5.

The City began to hold meetings with Plaintiff and the neighbors, sometimes

together and sometimes separately, and a mediator was brought in.  *See* Plaintiff's Ex.

1 at 88-97; Ex. 2 at 27-28, 50-52; Ex. 15 (Depo. of neighbor Jami Boyat) at 54-55; Ex.

23 (Plaintiff's answers to interrogatories) at 4; Ex. 36 at 5.  Members of the police

department told the neighbors to call if they had complaints regarding the El Dorado,

because without complaints the police could not do anything.  *See* Plaintiff's Ex. 26

(Depo. of Jack Chism) at 93.  In addition, the police department instituted a "zero

tolerance" policy requiring any officer who went to the El Dorado to issue a summons

wherever there was probable cause to issue a summons, whether to the club or a

neighbor.  Plaintiff's Ex. 19 (Depo. of Officer Paugh) at 18-19; Ex. 22 (Depo. of Officer

Josifek) at 23-24.  In total, Plaintiff received two or three citations for noise and parking

violations, and other employees of the El Dorado also received citations.  *See* Plaintiff's

---

[2] Defendants have used the same lettering scheme for their exhibits, so I will refer to their exhibits simply by letter.  Plaintiff did use different sets of numbers for his responses to each Motion, but the exhibits included the same evidence.  Accordingly, I only refer to the exhibits attached to the response to the City's Motion, and I only cite the exhibits by number.  Also, even though many of the exhibits are excerpts of depositions, I use the original page numbering from the deposition transcript for clarity.

[3] Plaintiff originally submitted an affidavit that was not notarized but, with leave of the Court, substituted a notarized affidavit on October 7, 2008.

Ex. 1 at 32; Ex. 2 at 25; Ex. 22 (police report) at 10. The neighbors received no

citations. *See* Plaintiff's Ex. 1 at 105; Ex. 2 at 26; Ex. 36 at 4. Plaintiff has presented

evidence of the City's knowledge of alleged racism amongst the neighbors, but the

police never did anything in response. *See* Plaintiff's Ex. 1 at 75-76; Ex. 5 at 1; Ex. 23

at 4; Ex. 30; Ex. 36 at 5.

Plaintiff alleges that the City implemented policies and practices "to try to shut

down the El Dorado pursuant to the City's crime property ordinance." Response to the

City's Motion at 6. Plaintiff has cited no direct evidence of the contours of this

ordinance, but there is some indication that a certain number of violations, including

noise disturbance, in a certain period of time could lead to a property being closed

down, and that there was discussion of applying this ordinance to the El Dorado.

Plaintiff's Ex. 26 at 66-71.

On an unspecified date, Miguel Peralta signed an agreement to purchase the El

Dorado from SIM, with closing to occur on January 24, 2006. Defendants' Ex. L. On

January 25, Peralta signed a "Contract to Buy and Sell Real Estate." Plaintiff's Ex. 1 at

Depo. Ex. A. Defendant testified that some time in February, after Peralta had

purchased the business, he and his wife Maria Peralta were running an event, and

Plaintiff was there to train them. Plaintiff's Ex. 1 at 76-77. The police came to the El

Dorado four or five times that night, and during one of those visits, Officer Josifek came

and asked the Peraltas who they were. *Id.* When they told him they were the new

owners, he asked them why they were buying the place when it was going to be shut

down. *Id.* Plaintiff was standing right next to them when he heard Officer Josifek make

those comments. *Id.* at 77. In his affidavit, El Dorado manager Joel Pena Hernandez also states that he and his son were there and heard these comments. Plaintiff's Ex. 26 at 3-4. Plaintiff testified that after Officer Josifek left, Miguel Peralta told Plaintiff that he wanted to cancel the contract for the purchase of the El Dorado. Plaintiff's Ex. 1 at 80. Officer Josifek denied making those comments, Defendants' Ex. G at 7, and Peralta testified that he decided not to purchase the El Dorado because of noise complaints. Defendants' Ex. I at 17.

Along with the City and the three Officers who brought the present Motions, Plaintiff originally sued neighbors Duane Friedlan, Jami Boyat, and Larry Moorhouse. After stipulated dismissals, Plaintiffs' remaining claims are against the City and Officer Josifek for recovery under 42 U.S.C. § 1983 for violations of equal protection and substantive due process and for recovery under 42 U.S.C. § 1981 for interference with a contract with intent to discriminate because of Plaintiff's race.

## ANALYSIS

### A. Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "When applying this standard, [the court must] view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing

summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* (quotation omitted).

In order to rebut a motion for summary judgment, an opposing party must present evidence permitted by Rule 56 setting forth specific facts that would be admissible at trial. Fed. R. Civ. P. 56(e)(2); *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). Accordingly, speculation, opinion, or hearsay testimony is "not suitable grist for the summary judgment mill." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (quotation omitted). "Generalized, conclusionary, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Dean v. Allstate Ins. Co.*, 878 F. Supp. 1397, 1401 (D. Colo. 1993) (quoting *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir. 1975) (citations omitted)). In addition, "the court may not rely on the assertions of legal counsel for the existence of factual allegations." *Dean*, 878 F. Supp. at 1401.

Defendants have argued that much of the evidence presented by Plaintiff is inadmissible and should not be taken into consideration for the purposes of the present Motions. Much of the evidence is in fact inadmissible, and Plaintiff's briefs are replete with counsel's citations to evidence for different propositions that what that evidence actually supports. The evidence upon which I rely in this Order is that which could be admissible at trial. I note, as a preliminary matter, that any statements made by representatives of the City, including police officers, are admissible at trial as non-

hearsay admissions by a party opponent, which are statements made by a party and offered against the party. *See* Fed. R. Evid. 801(d).

## B. Real Party in Interest

Federal Rule of Civil Procedure 17(a)(1) requires, "An action must be prosecuted in the name of the real party in interest." Defendants argue that SIM, and not Plaintiff, is the real party interest. The Tenth Circuit has held that a stockholder cannot maintain a personal action against a third party for harm caused to the corporation unless the actions of the third party cause injury that is unique to the shareholder. *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002); *see also Diversified Educ. Training and Mfg. Co. v. City of Wichita*, 473 F. Supp. 2d 1140, 1152 (D. Kan. 2007). In *Guides*, the plaintiffs were a corporation and its sole shareholder who had brought discrimination claims under 18 U.S.C. §§ 1981 and 1982. The Tenth Circuit held that because the corporation, and not the shareholder, had sought to contract with the defendants and lease property, the direct victim of the alleged discrimination was the corporation and not the shareholder. *Guides*, 295 F.3d at 1072; *see also Diversified*, 473 F. Supp. 2d at 1152. It further held that because the shareholder's alleged emotional distress arose from the corporation's failure to lease, her claim was derivative of the corporation's claim, and accordingly she did not have standing to sue on her own behalf. *Guides*, 295 F.3d at 1073; *see also Diversified*, 473 F. Supp. 2d at 1152-53.

Like in *Guides*, in the present case, Plaintiff has alleged no injuries that are unique to himself and distinct from those of the corporation. SIM was the legal owner of

the El Dorado. Accordingly, because the alleged injuries with regard to both Section 1981 and 1983 claims surround the El Dorado, the real party in interest is SIM and not its owner, Plaintiff Javier Stone. Specifically with regard to the Section 1981 claim, the party attempting to contract was SIM and not Plaintiff. Accordingly, I find that the real party in interest is SIM, not Plaintiff. *See Guides*, 295 F.3d at 1072 (corporation has standing to assert discrimination claims where such discrimination is based on the race of its employees).

However, I find that summary judgment on those grounds is unwarranted at this time. Rule 17(a)(3) provides:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

In deciding whether to allow substitution, cases in the Tenth Circuit "focus primarily on whether the plaintiff engaged in deliberate tactical maneuvering (i.e. whether his mistake was 'honest'), and on whether the defendant was prejudiced thereby." *Esposito v. United States*, 368 F.3d 1271, 1276 (10th Cir. 2004) (citing *Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1270 (10th Cir. 1997) (upholding district court's joinder of real party in interest because plaintiff's failure to include certain parties "was not the result of some tactic designed to prejudice defendant" and "there has been no tangible showing that defendant was prejudiced by the joinder"); *Metro. Paving Co. v. Int'l Operation Union of Eng'rs*, 439 F.2d 300, 306 (10th Cir. 1971) (permitting substitution of

corporations for joint venture where "it was clear from the outset that the three corporations were the real parties in interest" and "there was no prejudice to the defendant," even though applicable statute of limitations had run at time of substitution)).  Although Defendants' objection may have first been raised in April 2007, they have made no showing that Plaintiff failed to substitute due to "deliberate tactical maneuvering" or that they would suffer prejudice.  Like *Metropolitan Paving*, this case is one in which Defendants knew from the outset that SIM was the real party in interest, and accordingly they will suffer no prejudice if substitution is allowed.  Accordingly, as Plaintiff has proposed, he shall move to substitute SIM as the real party in interest not later than Monday, April 13, 2009.

## C. Section 1983

### 1. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment directs that the government "must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793 (1997).  Accordingly, Plaintiff must present evidence that Defendants treated other similarly situated entities differently.  *See Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).  Plaintiff ultimately must demonstrate that Defendants acted with discriminatory intent.  *See Washington v. Davis*, 426 U.S. 229, 239 (1976).  Such intent may be inferred from circumstantial evidence.  *See id.* at 242; *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1107 (10th Cir. 2001).

I find that Plaintiff has presented evidence that creates a genuine issue of

material fact with regard to the City's discriminatory intent.  Plaintiff has presented

evidence in the form of depositions of "bureau commander" Jack Chism and neighbor

Jami Boyat that the building occupied by the El Dorado was previously Vietnamese-

owned and used for similar events.  *See* Plaintiff's Ex. 26 at 63, 92-93; Ex. 15 at 15.

While Boyat testified that the Vietnamese-run events hall caused no problems with

parking or noise, whether that establishment is similarly situated to the El Dorado is a

question of fact for a jury to resolve.  *See Riggs v. Airtran Airways, Inc.* 497 F.3d 1108,

1117 (10th Cir. 2007) ("whether two [entities] are similarly situated ordinarily presents a

question of fact for the jury") (quotation and alteration omitted); *Harlen Assocs. v. Inc.*

*Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).  Plaintiff also testified in his

deposition that Defendants treated other rental halls in the area differently.  Defendants'

Ex. A at 147.  Defendants cite a District of Connecticut case for the proposition that

Plaintiff has to present evidence that entities treated differently are "*prima facie*

identical," but that case is inapposite because the court applied that standard to an

equal protection claim based on a "class of one."  *See 290 Farmington Avenue, L.L.C.*

*v. Town of Plainville*, 485 F. Supp. 2d 87, 91 (D. Conn. 2007).  In that case, the plaintiff

had alleged that it was being discriminated against as a "class of one" because its

patrons were Hispanic.  *Id.* at 90.  In contrast, in the present case Plaintiff is Hispanic,

and accordingly he belongs to a protected class for the purposes of equal protection.

Plaintiff has also presented other circumstantial evidence of discriminatory intent

on the part of the City.  Plaintiff has presented evidence that the City knew there was a

"climate of discrimination and harassment surrounding the El Dorado" but did nothing

about it, instead taking the neighbors' side when they made complaints.  Response to City's Motion at 13-14.  One e-mail apparently exchanged between City representatives reads, "There are issues with the neighborhood in terms of racial bias, potential ethnic intimidation, and harassment."  Plaintiff's Ex. 30.  A police report filled out by an Officer Fischer documents his response to a noise complaint by Duane Friedlan.  *See* Plaintiff's Ex. 5.  When Fischer explained to Friedlan that the noise had been coming from a car stereo and not the club, Friedlan "still blamed the El Dorado Club, saying that it's there [sic] 'no abla [sic] English crowd.'"  Ex. 5 at 1; *see also* Ex. 32 (Depo. of Friedlan) at 59-60.  Plaintiff testified and El Dorado manager Hernandez states that they told the police about neighbors calling them racial slurs, and the police did nothing about it.  Ex. 1 at 75-76; Ex. 23 at 4; Ex. 36 at 5.  Hernandez further states that at meetings involving the El Dorado, neighbors, and police, "the neighbors talked about living in a tight community and wanting to keep out any outsiders."  Ex. 36 at 5.  He also testified that at one event, the police pinned all responsibility on the El Dorado when a party at the Vietnamese Church down the street may have been to blame.  *Id.* at 3.  Finally, Plaintiff testified that he knew of another Hispanic-owned nightclub in Wheat Ridge that had closed its doors because of noise complaints and harassment by police.  Ex. 1. at 111-12.  Defendants have not presented any evidence to contradict this testimony, nor have they alleged that this evidence is inadmissible in any way.  Coupled with the evidence that the City treated similarly situated entities differently, this circumstantial evidence presents a genuine issue of material fact as to whether the City evinced discriminatory intent.

However, Plaintiff's equal protection claim against Officer Josifek does not

survive summary judgment because Plaintiff has failed to provide evidence attributing any discriminatory intent to Josifek.  Plaintiff bases his allegations of discriminatory intent, first, on two incidents in which Josifek responded to complaints from neighbor Larry Moorhouse and issued one citation and one warning although he could only hear a light or low thump from Moorhouse's residence.  Response to Josifek's Motion at 2. Second, Plaintiff alleges that on other occasions, Josifek "did not even check the noise level before telling the El Dorado to turn down the music."  *Id.*  Plaintiff further alleges that Josifek gave no warnings with regard to inaccuracies of neighbors' complaints and gave them no false reporting or harassment citations.  Response to Josifek's Motion at 2-3.  Also, Plaintiff alleges that Officer Josifek issued violations even when he did not personally observe any violation and that he threatened El Dorado management on certain nights that if he got any further complaints, he would return to issue citations even if those complaints were unverified.  Complaint at 4-5; Response to Josifek's Motion at 3.  Finally, Plaintiff provides Josifek's statement to the Peraltas as evidence of discriminatory intent.  Plaintiff's Ex. 1 at 76-77.

Even drawing all reasonable inferences in favor of Plaintiff and assuming the evidence supports his allegations, there is no genuine issue of material fact as to whether Officer Josifek intended to discriminate against Plaintiff because he is Hispanic. Plaintiff has presented no evidence that Officer Josifek treated any other similarly situated individuals in a dissimilar manner, and his circumstantial evidence of discriminatory intent does not pertain to Josifek.  Accordingly, summary judgment as to Plaintiff's Section 1983 equal protection claim against Officer Josifek will be granted.

**2. Substantive Due Process**

"'[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). "[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007) (quotation omitted). The Tenth Circuit has further provided with regard to the standard for substantive due process:

> Our cases recognize a § 1983 claim for a violation of Fourteenth Amendment substantive due process rights in the narrowest of circumstances. The conduct alleged must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. It must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. This standard is met in only the most extreme circumstances, typically involving some violation of physical liberty or personal physical integrity.
> The Supreme Court sets a similarly high hurdle for substantive due process claims. It has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.

*Becker v. Kroll*, 494 F.3d 904, 922-23 (10th Cir. 2007) (quotations, alterations, and citations omitted).

The alleged conduct by the City and the evidence in support thereof do not support a substantive due process claim, because they do not rise to the high threshold

established by the Supreme Court and Tenth Circuit.  None of Plaintiff's allegations rises to the level of "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  *Id.*  Plaintiff cites cases from other circuits for the propositions that goodwill of one's business and the pursuit of a chosen occupation are property interests entitled to protection under the Fourteenth Amendment. Response at 15 (citing *LPI Downtown Investors 1 v. Mun. Court of the County of Los Angeles*, 51 F.3d 281, 1995 WL 146820, at *1 (9th Cir. Apr. 4, 1995) (goodwill); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989) (goodwill); *Marrero v. City of Hialeah*, 625 F.2d 499, 514-15 (5th Cir. 1980) (goodwill); *Stidham v. Texas Comm'n on Private Sec.*, 418 F.3d 486, 491 (5th Cir. 2005) (pursuit of chosen profession)).  These cases are inapposite for two reasons.  First, the cases finding that business goodwill is a protected property interest rely on state law.  *See LPI*, 51 F.2d 281 at *1 (California law); *Sorrano's*, 874 F.2d 1310 at 1316 (California law); *Marrero*, 625 F.2d at 515 (Florida law).  Plaintiff has cited no Colorado law indicating that business goodwill is a protected property interest.  *See Teigen*, 511 F.3d at 1079 ("Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.") (internal quotation omitted)).  Second, the only one of these case to address substantive, rather than procedural, due process is *LPI*, in which the Ninth Circuit held, "The clear import of [plaintiff's] allegations is that defendants had no legitimate basis for [their actions]."  51 F.2d 281 at *2.

        In the present case, Plaintiff's allegations that the City "destroyed Plaintiff's

business," Response to City's Motion at 16, simply do not rise to the level of arbitrary action or conscience-shocking conduct. Plaintiff alleges that the City, among other things, (1) repeatedly interrupted the events at the El Dorado with warnings, threats, or citations, (2) encouraged complaints, knowing they were often unsubstantiated, (3) required police officers to issue citations anytime there was probable cause to do so, and (4) forced the El Dorado into the category of "crime property" in order to enforce the crime property ordinance against the El Dorado. *Id.* at 16-17. Plaintiff accordingly contends that the City's actions were arbitrary, capricious, and conscious-shocking because there was no rational, nondiscriminatory basis for those actions and because responses to noise complaints did not implicate public safety or welfare concerns. *Id.* at 17. Even assuming the evidence cited by Plaintiff creates a genuine issue of material fact as to his allegations, Plaintiff has provided no authority in which any court found analogous conduct to rise to the level alleged by Plaintiff. In contrast, Defendant has provided several cases involving arguably more outrageous conduct in which the Tenth Circuit did not find a substantive due process violation. *See, e.g.*, *Marino v. Mayger*, 118 Fed. Appx. 393 (10th Cir. 2004) (no violation where deputies refused to enforce the terms of court orders, allowed co-defendant to dig a ditch across plaintiffs' property, and threatened to arrest one of the plaintiffs when he came outside his house to protest; co-defendant eventually struck plaintiff violently in the head with a shovel). Because Plaintiff has failed to meet the high bar set for substantive due process claims, summary judgment as to his substantive due process claim against both Defendants will be granted.

**D. Section 1981**

To prevail on a section 1981 claim, Plaintiff must show that (1) Defendants intended to discriminate against Plaintiff because he is Hispanic and (2) the discrimination interfered with the making or enforcing of a contract. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Hampton v. Dillard Dep't Stores, Inc.*, 274 F.3d 1091, 1102 (10th Cir. 2001). This claim centers around whether Officer Josifek interfered with Plaintiff's contract to sell the El Dorado to Miguel Peralta when he allegedly asked the Peraltas why they wanted to purchase the club when it would be shut down. *See* Plaintiff's Ex. 1 at 76-77; Ex. 36 at 3-4. Because, as described above, Plaintiff has not provided evidence to show that Officer Josifek acted with discriminatory intent, Plaintiff's Section 1981 claim against him does not survive summary judgment. Further, I find that Plaintiff has not met his burden to survive summary judgment as to this claim against the City, because he has not shown, through this singular statement, a direct causal link between a custom of discriminatory practices by the City and the interference with the contract rights. *See Collins v. City of Harker Heights*, 503 U.S. 115, 123 (1992). This link is a requirement for the City's liability, as I will elaborate below.

**E. Liability**

**1. Qualified Immunity**

Defendant Officer Josifek has raised the affirmative defense of qualified immunity, which he contends shields him from liability. "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "When a defendant raises a qualified immunity defense, the plaintiff bears the burden of establishing that the defendant's conduct violated a constitutional or statutory right and that the right was clearly established at the time of conduct." *Perez v. Unified Gov't of Wyandotte County/Kansas City, Kan.*, 432 F.3d 1163, 1165 (10th Cir. 2005). Courts now have the discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

I first note that Officer Josifek was performing discretionary functions when he committed the alleged violations. Plaintiff has not argued to the contrary, and, drawing all inferences in favor of Plaintiff, the evidence warrants a finding that all the alleged violations, including his statement to the Peraltas, occurred during the course of performance of discretionary functions in the form of Josifek's responses to complaints of noise violations. I conclude that because Plaintiff has not provided evidence to create a genuine issue of material fact as to Officer Josifek's alleged constitutional violations, these violations certainly were not clearly established at the time of his alleged conduct. *See Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) ("The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains."). Accordingly, Officer Josifek is entitled to qualified immunity.

**2. Municipal Liability**

A municipality can be found liable for violations under Sections 1981 and 1983 only where the municipality itself causes the violations. *See Collins*, 503 U.S. at 123 (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). Accordingly, to prevail on his claims against the City, Plaintiff must show that city officials acted pursuant to a custom or policy of discriminatory practices. *See Carney*, 534 F.3d at 1273; *Randle v. City of Aurora*, 69 F.3d 441, 446 n.6 (10th Cir. 1995) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989)). In addition, Plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Collins*, 503 U.S. at 123. Liability may be imposed on a municipality if the execution of a policy or custom caused an individual to suffer a constitutional deprivation and the policy or custom was the "moving force" behind the constitutional deprivation. *Monell*, 436 U.S. at 694.

The Tenth Circuit has held a policy is a "decision officially adopted and promulgated by that body's officers." *Miller v. City of Mission, Kan.*, 705 F.2d 368, 374-75 (10th Cir. 1983) (quoting *Monell*, 436 U.S. at 690). The policy must be made by someone who is a "final decisionmaker" possessing final policymaking authority. *Randle*, 69 F.3d at 447 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-85 (1986)).[4] The Tenth Circuit has followed Supreme Court jurisprudence to find three

---

[4] Plaintiffs cite the following proposition from this District: "Absent a concrete official policy, an inference of the existence of a policy can only be drawn from a well-established pattern." *Pierce v. Delta County Dep't of Soc. Servs.*, 119 F. Supp. 2d 1139, 1155 (D. Colo. 2000) (citing *Brandon v. Holt*, 469 U.S. 464 (1985)). However, the Supreme Court case cited by Judge Nottingham has nothing to do with the proposition for which he was citing it. I find that although a policy does not have to be "concrete" or "official," the notion of a "well-established pattern of conduct" refers to whether there is a custom of

elements that help determine whether an individual is a "final policymaker": "(1) whether the official is meaningfully constrained 'by policies not of that official's own making;' (2) whether the official's decision [sic] are final - i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle*, 69 F.3d at 448 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Plaintiff's allegations do not support a finding of a policy of discrimination, because he has not identified a final decisionmaker who made this policy. Plaintiff has submitted numerous e-mails and depositions in conjunction with his responses, but none of them identifies who in particular made any policy. *See* Plaintiff's Ex. 19, 22, 26, 30, 31. Accordingly, I cannot find there to be an official policy of discriminatory practices.

With regard to what constitutes a custom of discriminatory practices for the purposes of municipal liability, the Tenth Circuit has provided:

> A custom has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law. In order to establish a custom, the actions of the municipal employees must be continuing, persistent and widespread. In attempting to prove the existence of such a "continuing, persistent and widespread" custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way. Indeed, a plaintiff's failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices.

*Carney*, 534 F.3d at 1274 (internal quotations and citations omitted).

I find that there is a genuine issue of material fact as to whether there was a

---

discriminatory practices.

continuing, persistent, and widespread custom of discriminatory practices that was a moving force behind the alleged discrimination. Plaintiff alleges that "the City conspired to . . . shut down the El Dorado pursuant to the City's crime property ordinance." Response to City's Motion at 10. Hernandez states in his affidavit, "I was told by police officers on at least five occasions that the Eldorado [sic] was going to be shut down." Plaintiff's Ex. 36 at 4-5. Officer Paugh testified in a deposition that everyone received an e-mail from the "department" saying that if anyone went to the El Dorado, somebody had to be issued a summons wherever there was probable cause to issue a summons, whether it was the club or a neighbor. Response Ex. 19 at 18-19. This was referred to as a "zero tolerance" policy, and it took away the officers' usual discretion in issuing citations. *Id.* Officer Josifek also testified to receiving this e-mail about "zero tolerance," and he further testified that this was not the standard usually applied. Plaintiff's Ex. 22 at 23-24. Like Officer Paugh, Officer Josifek testified that the zero tolerance policy was intended to apply to neighbors as well as the club. Defendants' Ex. M at 64-65. However, the neighbors received no citations, for false reporting or harassment. *See* Plaintiff's Ex. 1 at 105; Ex. 2 at 26; Ex. 36 at 4. Plaintiffs have also presented testimony of police showing up several times during one event, including before events had started. *See* Plaintiff's Ex. 1 at 106; Ex. 2 at 22; Ex. 36 at 2, 4-5.

Most importantly, Plaintiff has presented evidence of similar discrimination as to others, through his testimony that another Hispanic-owned club in the City was forced to close as a result of police harassment through multiple responses to noise complaints. *See* Plaintiff's Ex. 1 at 111-12. Accordingly, I find that there is a genuine issue of

material fact as to whether there was a continuing, persistent, and widespread custom of discriminatory practices that was a moving force behind the alleged violation, and Plaintiff's equal protection claim against the City pursuant to Section 1983 survives summary judgment.

**CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the Motion for Summary Judgment of Defendant the City of Wheat Ridge [doc. #179, filed March 26, 2008] is **GRANTED in part and DENIED in part**. It is granted as to Plaintiff's Section 1981 claim and his Section 1983 claim for violation of substantive due process. It is denied as to Plaintiff's Section 1983 claim for violation of equal protection. It is

FURTHER ORDERED that the Motion for Summary Judgment of Wheat Ridge Police Officers Paugh, Hester, and Josifek [doc. #180, filed March 26, 2008] is **GRANTED**. It is

FURTHER ORDERED that Plaintiff shall move to substitute Stone International Market, Inc. as the real party in interest not later than **Monday, April 13, 2009**.

Dated: March 31, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge